UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

B. CRAIG FINCHUM )
)
V. ) NO. 2:10-CV-258
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation regarding this action for judicial review of the administrative denial of the plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. The applications were denied following an administrative hearing before an Administrative Law Judge. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 8 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even

if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 37 years of age, a "younger" individual, with a limited education. The ALJ found that he could not return to his past relevant work.

Earlier applications were denied by the ALJ in 2007. The plaintiff's disability onset date for purposes of the present applications was November 20, 2007. The plaintiff's medical history pertinent to his conditions is adequately summarized in the Commissioner's brief as follows:

> The record indicates that Finchum had a history of back pain going back to 2001 (*see e.g.* Tr. 253, 255, 261). In February 2004, Finchum had back surgery (Tr. 229). He improved in the two months after the surgery, but returned to his physician early on one occasion because he lost his pain medication prescription (Tr. 228, 230-31). Dr. James K. Maguire told Finchum that he could return to work 23 days after the surgery, provided that he did no forklift driving, lifting of more than 15 pounds, or repetitive stooping or bending (Tr. 230). By May 2004, Finchum was "still doing fairly well" but had some pain in his buttocks (Tr. 226).
> In June 2004, Finchum began seeing Dr. Michael Chauvin for pain management (Tr. 201-02). Dr. Chauvin noted that Finchum had back and sacroiliac (pelvic joint) pain, as well as a straight leg raising tests that produced pain in the back, but that his exam was otherwise normal (Tr. 201). X-rays showed some narrowing, but were otherwise relatively normal (Tr. 201). At the time, Finchum also indicated that he was working 60 to 80 hours a week doing hard farm labor (Tr. 201). Dr. Chauvin prescribed narcotic pain medication and administered several back injections over the next year (Tr. 183,185, 187, 193-94). He also diagnosed Finchum with failed back syndrome, lumbar spondylosis, and sacroiliac joint pain (Tr. 198).
>
> Dr. Chauvin (and others at his office) continued to prescribe and adjust

2

Finchum's pain medication (Tr. 187-202), with Finchum noting in February 2005, that the medications were helpful without significant side-effects (Tr. 186). In April 2005, Finchum stated that he wanted to change his pain medications because they were no longer working (Tr. 296). He was not sure of the dosages and names of the pain medications he was taking (Tr. 296). Although Finchum claimed to have a pain level of seven on a 10-point scale, a nurse practitioner noted that Finchum's claimed pain level did not match his appearance (Tr. 296). In particular, Finchum moved around "quite freely," and smiled, conversed and laughed easily (Tr. 296). The nurse practitioner then decided to delay changing Finchum's medications for 30 days (Tr. 296). He also noted that Finchum was tender in his back and sacroiliac (pelvic) joints, but had normal gait (Tr. 296). The nurse practitioner further wrote that Finchum had chronic intractable back pain related to spondylosis (osteoarthritis), lumbar disc displacement, failed back surgery, and sacroiliac joint pain (Tr. 296). In the next few months, Dr. Chauvin and his nurse practitioners altered Finchum's medications, with Finchum once complaining that his medication made him tired (Tr. 291-94).

In August 2005, Finchum was discharged from Dr. Chauvin's practice after a nurse practitioner said that he used more pain medications than he was prescribed (Tr. 291-92). Finchum had recevied permission from Dr. Chauvin's office to use extra pain medication because Finchum reported that he believed that he had a kidney stone (Tr. 291, 293). Finchum said that he interpreted that permission to mean that he could take extra pain whenever he thought that might have a kidney stone (Tr. 291). The nurse practitioner noted that Finchum had not been to an emergency room or a physician for complaints of a kidney stone (Tr. 291).

In his previous applications for disability (which was denied and is not before the Court), Finchum alleged that he became disabled in September 2005, one month after he was discharged from Dr. Chauvin's practice (Tr. 46).

In June 2006, Dr. David McConnell examined Finchum on behalf of the state agency in connection with his previous applications for disability (Tr. 209-213). Finchum told Dr. McConnell that he no longer visited Dr. Chauvin because his health insurance ran out (Tr. 213). Finchum also said that he had not been back to see Dr. McGuire because he does not want back surgery (Tr. 213). Dr. McConnell noted that Finchum was not under the care of any orthopaedic surgeon (Tr. 213).

Dr. McConnell observed that Finchum was 67 pounds overweight and had some limits in the range of motion of his back, but he had normal reflexes and negative straight leg raising tests (Tr. 210-11). There was also no evidence of spasm or sensory or motor deficit in the lower extremities (Tr. 210-11). An x-ray of the spine showed no problems, with the surgical hardware (from Finchum's previous back surgery) in good position and alignment without fractures (Tr. 210). Dr. McConnell assessed Finchum as having chronic back pain, and opined that Finchum was limited to lifting/carrying 40 pounds occasionally and 35 pounds frequently and could stand/walk as well as sit for six hours out of an eight-hour workday (Tr. 210).

One month later, in July 2006, Dr. John P. Fields reviewed Finchum's records for the state agency in connection with his previous applications for disability (Tr. 214-19). He thought that Finchum's allegations were only partially credible and that

the medical findings did not show that Finchum's impairments were as severe as he alleged (Tr. 219). Dr. Fields opined that Finchum could lift/carry 50 pounds occasionally and 25 pounds frequently and stand/walk and sit (each) for six hours out of an eight-hour day (Tr. 215). He assessed no postural limitations (Tr. 216).

In August 2006, Finchum returned to Dr. Maguire. Dr. Maguire noted that Finchum was in a moderate amount of distress, with some limitation in the range of motion of his back, a positive straight leg raising test, and tenderness to palpation in parts of his spine (Tr. 225). However, he also had normal sensation, strength, and reflexes (Tr. 225). Also, Dr. Maguire thought that Finchum's "x-rays looked pretty good," even if he could not be "100% certain" that the hardware from Finchum's previous surgery had fused (Tr. 223).

One day after seeing Dr. Maguire, a physician at SMMC Pain Management Clinic administered a spinal injection and prescribed pain medication (Tr. 239-240). One month later, Finchum's pain was significantly decreased, but he still had pain in his lower extremities (Tr. 235). He then had another spinal injection (Tr. 236). However, SMMC Pain Management Clinic discharged Finchum because his urine tested was positive for THC (marijuana) and a narcotic pain medication which the clinic did not prescribe to him (Tr. 235).

Finchum then saw Dr. Williams for back and shoulder pain from October 2006 through December 2008 (Tr. 319-323, 388). During that period, in September 2007, a scan of Finchum's hip was normal and a scan of his lumbar spine showed post operative changes and spondylosis (osteoarthritis) in one location (Tr. 337, 339). An MRI of his Finchum's left shoulder showed possible rotator cuff tears and edema (fluid accumulation) (Tr. 336). One month later, Dr. James D. Jordan examined Finchum's shoulder, noting that his findings were consistent with impingement and that Finchum had mild tenderness in one joint, but that Finchum had good range of motion (Tr. 393). Dr. Jordan then administered an injection to Finchum's left shoulder (Tr. 393).

In February 2008, Finchum began seeing Dr. Nicholas Grimaldi, complaining of back pain going down to his left leg, as well as pain in his left shoulder (Tr. 358). Dr. Grimaldi noted that Finchum's back was tender and that his ability to forward flex his back was limited due to pain (Tr. 358). However, Finchum had normal leg strength and was able to squat and stand on his toes and heels without difficulty (Tr. 358). Also, Dr. Grimaldi wrote that Finchum's "left shoulder [was] doing fine" with some crepitus (cracking sounds with movement), but normal strength and range of motion (Tr. 358). Dr. Grimaldi assessed low back pain and left leg radiculitis (radiated pain) (Tr. 358).

One month later, Dr. Grimaldi noted that Finchum tried to stay on his right side while sitting and had a pain trigger point on his back (Tr. 357). But he also observed that Finchum was "resting comfortably," and had normal leg strength and negative straight leg raising test (Tr. 357). Dr. Grimaldi administered a back injection, but Finchum reported that he did not notice much improvement (Tr. 357). Dr. Grimaldi suggested that Finchum see Dr. Chauvin (because Finchum had previously experienced reduction in pain under Dr. Chauvin's treatment), but

4

Finchum said that Dr. Chauvin no longer took his insurance (Tr. 357).

That same month, an MRI of the lumbar spine showed facet joint tropism (asymmetry) in one location (Tr. 361). In another location, there was marked chronic disc dessication (dryness) with complete effacement of the disc and spondylolisthesis (vertebra slipped out of position) (Tr. 361). Secondary to the spondylolisthesis, there was distortion of the neuroforamina, with findings that were highly suspicious of formainal stenosis (narrowing) (Tr. 361).

Dr. Grimaldi saw Finchum in May and June 2008, noting each time that he had pain with certain movements of his back and leg, but that he was resting comfortably in no apparent distress (Tr. 356-57). In June 2008, Finchum also had some pain with certain movements of his left shoulder, but experienced 80% improvement after an injection (Tr. 356). A shoulder x-ray showed some mild joint arthropathy in the right shoulder and mild lytic lesions and mild hypertrophy (increase in volume) in the left shoulder (Tr. 359).

Dr. Grimaldi referred Finchum to Dr. Paul L. Jett, who noted that Finchum had tenderness over the sacroiliac (pelvic) joint region and Faber testing that indicated sacroiliac joint dysfunction (Tr. 354). But Dr. Jett also observed that Finchum had normal strength, reflexes, and sensory exam, no edema, and negative straight leg raise tests (with limited range of motion on the left) (Tr. 354). Dr. Jett then administered an injection to Finchum's sacroiliac joint (Tr. 352). One month later, Dr. Jett noted that Finchum's sacroiliac pain had improved and that there was minimal tenderness in his lower back (Tr. 350). However, Finchum still
complained of feeling as though he had a weight in his lower back (Tr. 350). Dr. Jett administered another injection and noted in August 2008 that Finchum had no leg pain, but still complained of back pain (Tr. 347). Finchum had some tenderness in his lower back (which was worse with certain movements), but was in no acute distress, had a negative straight leg raise, and a slow, but not antalgic (pain-altered), gait (Tr. 347). Dr. Jett did not believe that any further interventional procedures were warranted (Tr. 347).

Three and a half weeks later, Dr. Grimaldi noted that Finchum was uncomfortable and in pain (Tr. 356). Finchum had pain with movement of his hips and a positive straight leg raising test, but he did have good sensation in his legs (Tr. 356). Two months later, in October 2008, Dr. Jordan administered a shoulder injection, after noting that Finchum had impingement in his left shoulder with minimal tenderness in one shoulder joint (Tr. 392). The injection was "quite
beneficial" with Finchum regaining the full range of motion of his shoulder, but Finchum still had impingement by January 2009 (Tr. 391).

In the meantime, in October 2008, Dr. Kanika Chaudhuri reviewed Finchum's records for the state agency (Tr. 377-384). She opined that Finchum could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. Tr. 378. Dr. Chaudhuri also wrote that Finchum could sit/stand and sit (each) for six hours out of an eight-hour day. Tr. 378. She further indicated that Finchum could only occasionally climb, balance, stoop, kneel, crouch, crawl, or reach overhead with his left upper arm extremity (Tr. 380). In reaching her opinion, Dr. Chaudhuri noted that

5

she considered Finchum's pain, but pointed out that Finchum's SI joint (pelvic joint) had improved and no more intervention was recommended (Tr. 384).

In April 2009, Dr. Kennedy examined Finchum and reviewed his medical records (Tr. 394-400). Dr. Kennedy noted that Finchum had decreased range of motion in his lumbar spine, had positive straight leg raising tests, and Waddell's signs that did not show symptom magnification (Tr. 398). But Finchum walked without a limp, did not use any supportive device, and had normal reflexes and posture, and no muscle atrophy in his lower extremities (Tr. 398).

Dr. Kennedy opined that Finchum could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently (assuming a level lift, push, or pull) (Tr. 400). But Dr. Kennedy restricted Finchum to no repeated bending, stooping, squatting, or climbing (Tr. 400), and no running, jumping, crawling, or working on his kneels or with his arms raised above his shoulders (Tr. 399). Dr. Kennedy further wrote that Finchum could not work with any jostling, jerking, bouncing, or sudden starts and stops (Tr. 399-400). In addition, Dr. Kennedy opined that Finchum could not work over rough terrain or slippery or sloping surfaces, in rough vehicles, or in situations where his safety would depend on normal pain-free mobility and strength of his lumbar spine (Tr. 399-400). He also indicated that Finchum would need to control whether he sat or stood and would need to avoid heights and vibrations (Tr. 400). In addition, Dr. Kennedy commented that Finchum's injuries had made him weaker and more prone to future injuries (Tr. 399).

Dr. Norman E. Hankins, a vocational expert, and A. Bentley Hankins, a rehabilitation counselor, then evaluated Finchum. They opined that under Dr. Kennedy's restrictions Finchum was "no longer employable in his local labor market or in the national economy" (Tr. 410).

An MRI of Finchum's left shoulder in May 2009 showed a degenerative changes in one joint and a tendon tear (Tr. 416). One month later, Finchum had shoulder surgery (Tr. 414). As of August 2009, Finchum's shoulder was much improved and he was satisfied with the surgery (Tr. 412). Dr. Jordan noted that "because [Finchum's] ROM [range of motion] is so good, I will be seeing [Finchum] on an as-needed basis for any further concerns" (Tr. 412).

[Doc. 13, pgs. 3-11].

Dr. Theron Blickenstaff, a "medical expert," reviewed the plaintiff's medical records, listened to his testimony, and testified at the administrative hearing. Dr. Blickenstaff was quite impressed with the post-operative records of Dr. James Jordan, the last of which (Tr.

6

412) was dated just one month before the administrative hearing.[1] That record of Dr. Jordan showed a very good range of motion and no return visit scheduled. Dr. Blickenstaff opined that the plaintiff should be able to occasionally lift 25 pounds and frequently lift 20, with no "objective reasons" to limit postural motions. She also stated that "it would be prudent to limit strenuous repetitive overhead use of the right arm."[2] She concluded that "any other limitations would depend on the credibility of the subjective complaints." In so opining, Dr. Blickenstaff's testimony indicates that she was quite familiar with the records regarding the plaintiff's back pain.

Ms. Donna Bardsley, a vocational expert ["VE"], also testified at the administrative hearing. The ALJ asked her to assume a person of plaintiff's age, education and past work experience. He then asked her to "assume this person can do light work, occasional posturals, occasional overhead reaching with his left arm limited to simple, routine, repetitive work." When asked if there would be jobs, Ms. Bardsley identified 7,000 in the region and 5,500,000 in the nation which such a person could perform. When a sit/stand option was added, she identified 3,000 regional and 2,000,000 nationally. If plaintiff were completely credible regarding the intensity of his pain, there would be no jobs.

She was asked by plaintiff's attorney if there would be jobs if the assessment of Dr. William Kennedy were correct. She stated "I couldn't say there would be no jobs. It just isn't

---

[1] It should be noted that these records of Dr. Jordan post-date the records reviewed by Dr. Williams, and those which were before the state agency physician, Dr. Chaudhuri.

[2] In fact, as Dr. Blickenstaff later noted, the shoulder that was operated on was the plaintiff's left shoulder, the operative note notwithstanding. The Court agrees with Dr. Blickenstaff that the medical records speaking of the wrong arm is a "very disturbing thing."

7

going to be a full range of light based on that." However, when asked if she had "any significant disagreement" with the opinion of Dr. Norman Hankins that the plaintiff was now unemployable based upon Dr. Kennedy's assessment, she stated she "no." (Tr. 30-33).

In his hearing decision, the ALJ found that the plaintiff had the residual functional capacity ["RFC"] for light work, "except that he is limited to occasional climbing, blancing, stooping,, kneeling, crouching, crawling, and overhead reaching with his right arm. The claimant would have to work at a job with a sit/stand option." (Tr. 13). He noted that while the plaintiff's severe impairments could produce pain, he did not feel the severity of pain claimed by the plaintiff was "substantiated by objective medical evidence." He stated that it was his duty to "make a finding on the credibility of the statements based on a consideration of the entire case record." He found that the plaintiff was not credible in describing intensity of pain which was inconsistent with that RFC. In so doing, he gave great weight to the assessment of Dr. Chaudhuri, the state agency physician. The ALJ stated that he "does no accept the functional limitations specified by Dr. William E. Kennedy. Dr. Kennedy only saw the claimant on a one time basis in April 2009 and his opinion is not entitled to great weight." (Tr. 14).

Based upon the testimony of Ms. Bardsley, the ALJ found that there was a significant number of jobs which the plaintiff could perform. (Tr. 15). Accordingly, he found that he was not disabled. (Tr. 16).

Plaintiff asserts that the ALJ committed reversible error in failing to find the plaintiff completely credible, and therefore, the RFC posed to the VE is not supported by substantial evidence. Plaintiff points out that his attempt to return to work following back surgery

substantiates his credibility. Likewise, the opinion of Dr. Kennedy, the consultative examiner for the plaintiff, indicates he is incapable of substantial gainful activity. Plaintiff states that his testimony was consistent with uncontradicted medical evidence, and that the ALJ "pointed to no evidence which contradicted the plaintiff's complaints of disabling pain..."

Of course, there is evidence which by its very nature contradicts the plaintiff's subjective complaints, the medical assessment of the non-examining state agency physician, upon which the ALJ stated he "relied," and the testimony of Dr. Blickenstaff, which the ALJ does not mention in his hearing decision but which he obviously listened to at the administrative hearing. Both opined that the plaintiff was capable of at least a limited range of light work, which took into account the plaintiff's substantive complaints. No treating physician has rendered a medical assessment, although a great many of their treatment notes substantiate the fact that the plaintiff has significant, severe conditions which do cause substantial limitations.

However, as pointed out by the Commissioner, a number of these treatment records reviewed by Dr. Chaudhuri, and thus relied upon by the ALJ, indicate less severe findings than those of which plaintiff complains [Doc. 13, pgs. 14 and 15].

The ALJ's RFC accommodates the physical restrictions imposed by the plaintiff's conditions, but the ALJ has to be correct on the issue of the level of plaintiff's pain for him to be able to function in a job. It is also true of course that no one knows with absolute certainty how much pain a person is in except the person experiencing the pain. Any adjudicator must simply do the best they can with what objective evidence is available. Here the records show that while the plaintiff had a reduced range of motion and complained of

9

constant debilitating pain, he walked without a limp and without an assistive device, had normal reflexes and posture, and had no muscle atrophy in his lower extremities. (Tr. 356, 398). Common sense would tell a trier of fact that a person in intractable pain would have muscle atrophy, guarded posture, and a limp in an attempt to "get comfortable."

These facts were important to Dr. Chaudhuri, and thus important as support for the ALJ's finding. Under Sixth Circuit case law, Dr. Chaudhuri as a non-examining state agency physician is not entitled to less weight than Dr. Kennedy, a one time examiner. *See, Barker v. Shalala,* 40 F.3d 789 (6th Cir. 1994), *Ealy v. Commissioner of Soc. Sec.,* 594 F.3d 504 (6th Cir. 2010), and *Combs v. Commissioner of Soc. Sec.,* 459 F.3d 640 (6th Cir. 2006).

While this is a close case, the Court finds that there is substantial evidence to support the ALJ's finding regarding the plaintiff's credibility. Likewise, there is substantial evidence to support the hypothetical question to the VE and the finding that the plaintiff was not disabled. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 8] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[3]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).